**FILED**

JUN - 3 2008

Clerk, U.S. District and
Bankruptcy Courts

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE UNIVERSITY OF TEXAS )
M.D. ANDERSON CANCER CENTER )
1515 Holcombe Boulevard )
Houston, Texas 77030 )
)
      Plaintiff, )
)  Case: 1:08-cv-00946
    v. )  Assigned To : Kollar-Kotelly, Colleen
)  Assign. Date : 6/3/2008
MICHAEL O. LEAVITT, Secretary )  Description: Admn. Agency Review
United States Department of )
   Health and Human Services, )
200 Independence Avenue, S.W. )
Washington, DC 20201, )
)
      Defendant. )
_____ )

## COMPLAINT FOR SUMS DUE AND FOR DECLARATORY
## AND INJUNCTIVE RELIEF UNDER THE MEDICARE ACT

### I. INTRODUCTION

1.  This is an action for judicial review of a final decision of the Secretary of the

Department of Health and Human Services ("Secretary") regarding the amount of

reimbursement due the University of Texas M.D. Anderson Cancer Center ("UTMDA" or

the "Hospital") for services furnished to Medicare patients in the Hospital's fiscal years

ending August 31, 2000 and August 31, 2001.    In a decision dated April 4, 2008, the

Secretary's review board, the Provider Reimbursement Review Board ("PRRB" or "Board"),

affirmed the agency's payment determinations on two issues.  PRRB Dec. No. 2008-D23.

As shown below, the Board's decision on each issue is wrong, and must be set aside in

accordance with applicable provisions of the Administrative Procedure Act ("APA"), 5

U.S.C. § 706.

2. The first issue presented concerns the Board's decision as to the "reasonable cost" included in the denominator of a fraction used to calculate a payment-to-cost ratio that governs payment to the Hospital for services furnished to Medicare outpatients in the last month of its fiscal year ending August 31, 2000 and all of its 2001 fiscal year. As a cancer hospital, UTMDA is subject to a "hold-harmless" provision under a prospective payment system that became effective on August 1, 2000 for the costs of services furnished to hospital outpatients. Under that hold-harmless provision, the Hospital is entitled to be reimbursed the greater of: i) the standard fee schedule amounts paid under the prospective payment system for hospital outpatient services; or ii) a portion of the Hospital's current costs of services furnished to Medicare outpatients. *See* 42 U.S.C. §§ 1395*l*(t)(7)(D)-(F); 42 C.F.R. §§ 419.70(d)(2), (e)-(f).

3. To determine the portion of costs that are reimbursable to the Hospital under this hold-harmless provision, the Secretary is required to apply a "payment-to-cost" ratio derived from the Hospital's 1996 base year. 42 U.S.C. § 1395*l*(t)(7)(F)(ii). That ratio is calculated by dividing i) the amount of the Medicare payment made to the Hospital for outpatient services furnished to Medicare patients in the 1996 base year (the numerator), by ii) the "reasonable cost" of the services furnished in that 1996 base year (the denominator). *Id.*

4. The Medicare Act defines the term "reasonable cost" in 42 U.S.C. § 1395x(v). As defined therein, the term "reasonable cost" excludes 5.8% of the operating costs and 10% of the capital-related costs of services furnished by a hospital to outpatients. 42 U.S.C. § 1395x(v)(1)(S)(ii).

5. It is undisputed that the "reasonable cost" that was determined by the Secretary and reimbursed to the Hospital for the 1996 base period itself excluded 5.8% of the

2

Hospital's operating costs and 10% of its capital-related costs of services furnished to Medicare outpatients, consistent with the statutory definition of "reasonable cost" in section 1395x(v)(1)(S)(ii) of the Medicare Act.

6.   Nevertheless, in computing the payment-to-cost ratio at issue, the Secretary did not apply the statute's reasonable cost reduction factors in determining the base year "reasonable cost" that was included in the denominator used to calculate this ratio for the Hospital.   As a result, the denominator used in the Secretary's calculation was greater than it should be, the resulting payment-to-cost ratio is less than it should be, and the Hospital was underpaid pursuant to the hold-harmless provision applicable to part of the Hospital's 2000 fiscal year and all of its 2001 fiscal year.

7.    In a one-paragraph analysis of this issue, the Secretary's Board wrongly affirmed the Secretary's calculation.   The Board concluded, erroneously, that the 5.8% and 10% cost reduction factors are "a reduction to determine payments and do not equate a [*sic*] second calculation of reasonable cost."

8.   This aspect of the Board's decision is contrary to law and must be set aside. Payment for hospital outpatient services is prescribed in the Medicare Act at 42 U.S.C. § 1395*l*.    Section 1395*l*(a)(2)(B) of the Act limited payment for the 1996 base period to the lesser of the Hospital's customary charges for services furnished to hospital outpatients, or its "reasonable cost of such services, as determined under section 1395x(v)," or certain blended payment rate limits applicable to specific types of outpatient services.    The payment provision in section 1395*l* does not include the 5.8% and 10% cost reduction factors.   These factors are set forth only in the statutory definition of "reasonable cost" in section 1395x(v) of the Medicare Act.

3

9. The Board's decision on this issue is also arbitrary and capricious, and must be set aside, because it is an unexplained, irrational departure from established agency precedent. *See Transactive Corp. v. United States*, 91 F3d 232, 237 (D.C. Cir. 1996). There is no dispute, and the parties stipulated below, that in determining the Hospital's "reasonable cost" of services furnished to hospital outpatients for the 1996 base period itself, the Secretary included only the Hospital's net costs after application of the 5.8% and 10% reasonable cost reduction factors enumerated in the statutory definition of "reasonable cost." These factors were not separately applied in determining a lesser payment made pursuant to section 1395*l* of the Act for a greater amount of reasonable cost determined separately under section 1395x(v) of the Act; these cost reduction factors were applied through the Secretary's own cost reporting form and procedures for determining the "reasonable cost," as defined in section 1395x(v)(1)(S)(ii) of the Act, of services furnished to Medicare outpatients. Moreover, in other recent decisions, the Secretary has specifically found that the "reasonable cost" of outpatient services is the net costs after application of the 5.8% and 10% cost reduction factors. *See Decatur County Gen. Hosp. v. Blue Cross Blue Shield Ass'n / Riverbend Government Benefits Administrators*, CMS Adm'r Dec. in Review of PRRB Dec. No. 2007-D28 (June 27, 2007), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 81,751; *North Mem. Health Care v. Blue Cross Blue Shield Ass'n / Noridian Administrative Services*, CMS Adm'r Dec. in Review of PRRB Dec. No. 2007-D27 (June 27, 2007), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 81,752. The Board's inconsistent decision in this case is arbitrary and capricious.

10. The second issue in this case concerns the Board's decision affirming the agency's denial of the Hospital's request for a statutory adjustment to a payment limit, derived from a 1983 base year, applicable to the operating costs of services furnished to

4

Medicare inpatients. The Hospital requested, and the agency denied, an adjustment to the payment limit for fiscal years 2000 and 2001 to account for the costs of new drugs that were not included in the 1983 "base year" costs used to establish the payment limit.

11. As a cancer hospital, UTMDA is entitled to reimbursement for the reasonable cost of services furnished to Medicare inpatients, subject to a rate-of-increase ceiling on operating costs of inpatient hospital services. 42 U.S.C. § 1395ww(b); 42 C.F.R. § 413.40(a)(1). That ceiling, called the "target amount," is derived from the Hospital's average overall operating cost per discharge in a 1983 base year, updated for inflation.

12. The controlling provisions of the Medicare Act and implementing regulations require the Secretary to make an adjustment to the Hospital's target amount when "[a] change in the inpatient hospital services that a hospital provides" or other circumstances create a "distortion" in the comparison of current-year operating costs per discharge to the costs per discharge in the 1983 base year. 42 U.S.C. § 1395ww(b)(4)(A)(i); 42 C.F.R. § 413.40(g)(3).

13. The undisputed evidence in the record, including the stipulations of facts by the parties below, shows that for each of the two years at issue, the Hospital incurred approximately $4 million in costs for drugs that were furnished to Medicare inpatients in the years at issue that were not approved for use during the 1983 base year and therefore were not included in the target amount for the years at issue. The undisputed evidence and stipulations of the parties also show that for each of the two years at issue, the Hospital's costs of drugs furnished to Medicare inpatients exceeded its base year cost of drugs furnished to inpatients, adjusted for inflation and the number of discharges in each year, by approximately the same $4 million per year.

14. The undisputed record also shows that in denying the Hospital's request for an adjustment to its target amount, the Secretary's agency, the Centers for Medicare and Medicaid Services ("CMS"), considered only two factors – increases in patients' average length of stay in the Hospital and increases in staffing. In its written analysis of the Hospital's request for adjustment to the target amount, CMS effectively gave no consideration at all to the costs of new drugs that were furnished during the periods at issue but were not available in the 1983 base year. Because CMS's determination failed to give any consideration to costs of new services, that determination, and the Board decision affirming it, are contrary to law and should be reversed.

15. In its two-paragraph analysis of this issue, however, the Secretary's Board erroneously affirmed CMS's determination without addressing whether that determination, which gave no consideration to the cost of new drugs, was correct. Putting the cart before the horse, the Secretary's Board denied the Hospital's appeal on the alleged ground that the Hospital had failed to disprove the existence of any other possible offset to the undisputed costs it incurred in furnishing drugs that concededly were not included in the Hospital's base year costs. In this respect, the Board's decision is also unsupported by substantial evidence in the record and is otherwise arbitrary and capricious and, therefore, should be set aside.

16. Even if it would have been permissible for CMS to consider possible offsets to the costs the Hospital incurred to provide new drugs if CMS had considered the costs of new drugs at all (and it did not), there is no evidence in the record – and the Board's two-paragraph decision cites none – showing that there were any such offsets attributable to costs of items or services that had been replaced by new drugs. To the contrary, the undisputed record evidence shows that the costs the Hospital incurred in 2000 and 2001 to furnish new

6

drugs were not offset in any material way through reductions in costs of other services. Thus, the Board's decision is not based upon substantial evidence in the record and must be set aside.

17. But, even if there were any evidence of offsets attributable to the replacement of other items and services that were furnished in the base year (and there is none), the Secretary's Board should have ruled on whether it was appropriate for CMS not to give any consideration at all to the costs of new drugs and then remanded to CMS for any further proceedings required to determine the appropriate amount of adjustment that should be made considering both the costs of new drugs and offsets that should be made for items or services, if any, that were replaced by the new drugs.    The Board's decision is tantamount to an appellate court affirming a lower court's entry of a directed verdict finding of no liability based on the appellate court's conclusion that there is insufficient evidence in an incomplete record to negate any possible offsets that would mitigate undisputed evidence on damages. In this respect, the Board's decision is also arbitrary and capricious and should be set aside.

## II. JURISDICTION AND VENUE

18. This action arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the APA, 5 U.S.C. § 551 *et seq.*

19. Jurisdiction is proper under 42 U.S.C. § 1395oo(f).

20. Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

## III. PARTIES

21. Plaintiff is the University of Texas M.D. Anderson Cancer Center in Houston, Texas.    The Hospital is one of the nation's ten federally-designated comprehensive cancer

centers, and a world leader in cancer research and treatment. UTMDA participates in the Medicare program as a "provider" of hospital services.

22. Defendant is Michael O. Leavitt in his official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program. References to the Secretary herein are meant to refer to him, his subordinates, and to his official predecessors or successors as the context requires.

23. CMS is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program. Medicare payments to hospitals are determined in the first instance by fiscal intermediaries (usually private insurance companies) that contract with CMS under 42 U.S.C. § 1395h.

### IV.    MEDICARE PAYMENT AND APPEALS PROCESS

24. Part A of the Medicare Act covers inpatient hospital services. 42 U.S.C. § 1395d(a)(1).  Payment for these services is made to the Hospital pursuant to 42 U.S.C. §§ 1395f(b)(1) and 1395ww(b).

25. Part B of the Medicare Act covers hospital services furnished to outpatients. 42 U.S.C. § 1395k(a)(2)(B). Payment for these services is made to the Hospital pursuant to 42 U.S.C. §§ 1395l(a)(2)(B) and (t).

26. After the close of a hospital's fiscal year, a hospital prepares a "cost report" on forms prescribed by the Secretary and submits the report to the Secretary's contracted fiscal intermediary. *See* 42 C.F.R. §§ 413.20(b), 413.24.

27. The Medicare fiscal intermediary analyzes each annual cost report submitted by a hospital and issues a Notice of Program Reimbursement, or "NPR," that informs the

hospital of the intermediary's final determination of the Medicare reimbursement due the hospital for the fiscal period covered by the cost report. *See* 42 C.F.R. § 405.1803.

28.  If a hospital's operating costs of inpatient hospital services exceeds the target amount, the hospital may submit a request for an adjustment to the limit after the fiscal intermediary has issued an NPR for the fiscal year. 42 C.F.R. § 413.40(e). The Intermediary reviews the request for an adjustment and sends it to CMS with its recommendation. *Id.* CMS issues a determination on the request. *Id.*

29.  A hospital is entitled to appeal to the PRRB if it is dissatisfied with an intermediary's determination in an NPR as to the amount of Medicare payment due the provider for a cost reporting period, 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835, or if a provider is dissatisfied with CMS's decision on a request for an adjustment to the target amount limitation on reimbursement for operating costs of inpatient hospital services,   42 C.F.R. § 413.40(e)(4)(ii).

30.  The PRRB is an administrative tribunal appointed by the Secretary, 42 U.S.C. § 1395oo(h), that is bound by the Secretary's regulations and is required to "afford great weight" to the Secretary's "interpretive rules,"  42 C.F.R. § 405.1867.

31.  The decision of the Board, if not reviewed by the Administrator of CMS, constitutes the final determination of the Secretary. As such, it is reviewable in a civil action before this Court. 42 U.S.C. § 1395oo(f).

32.  This Court reviews the Secretary's final decision under the applicable provisions of the APA.  42 U.S.C. § 1395oo(f).

33. The applicable provisions of the APA require the Court to set aside the Secretary's final decision if it is in excess of the Secretary's statutory authority, arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706.

## V. FIRST ISSUE – PAYMENT-TO-COST RATIO FOR OUTPATIENT HOSPITAL SERVICES

### A.    Legal Authorities Regarding Payment for Hospital Outpatient Services

34. For periods prior to the fiscal years at issue, including the Hospital's 1996 base period used to calculate the payment-to-cost ratio for purposes of the hold-harmless payment at issue, Medicare reimbursed hospitals the lesser of their customary charges for services furnished to hospital outpatients, or their "reasonable cost of such services, as determined under section 1395x(v)," or certain blended payment rate limits applicable to specific types of outpatient services. 42 U.S.C. § 1395*l*(a)(2)(B).   The blended payment rates consisted of a portion of a hospital's reasonable cost (again, as defined in section 1395x(v) of the Act) and a portion of the standard fee schedule amount for freestanding entities.

35. Section 1395x of the Medicare Act is a definitional section.  Section 1395x(v) defines the term "reasonable cost."  42 U.S.C. § 1395x(v).   As defined therein, the term "reasonable cost" excludes 5.8% of the operating costs and 10% of the capital-related costs of services furnished to hospital outpatients.   42 U.S.C. § 1395x(v)(1)(S)(ii).

36. The regulations implementing the statute's definition of "reasonable cost" are set forth in 42 C.F.R. Part 413.  Part 413 of the regulations is entitled "Medicare Principles of *Reasonable Cost* Reimbursement." (Emphasis added.)   Part 413 acknowledges that the

"[r]egulations implementing section 1861(v) [1395x(v)] are found generally in this part [413] beginning at § 413.5." *See* 42 C.F.R. § 413.1(b).

37.  The reasonable cost regulation implementing the 5.8% cost reduction factor for operating costs of hospital outpatient services is codified at 42 C.F.R. § 413.124. In 1996, section 413.124 provided, in pertinent part, that "*the reasonable costs* of outpatient hospital services (other than capital-related costs of such services) *are reduced by 5.8%* for services furnished during potions of cost reporting periods occurring on or after October 1, 1990 and before October 1, 1998." 42 C.F.R. § 413.124 (1996) (emphasis added).

38.  The reasonable cost regulation implementing the 10% cost reduction factor for capital-related costs of hospital outpatient services is codified at 42 C.F.R. § 413.130(j). In 1996, section 413.130 provided, in pertinent part, that "the amount of *capital-related costs* of all hospital outpatient services is *reduced by * * * 10 percent* for portions of cost reporting periods occurring on or after October 1, 1991." 42 C.F.R. § 413.130(j)(ii) (1996) (emphasis added).

39.  In 1997, Congress amended the payment provision for hospital outpatient services, in section 1395*l* of the Medicare Act, by adding a new subsection (t) that required the Secretary to establish a prospective payment method for designated hospital outpatient services, effective January 1, 1999. Balanced Budget Act of 1997, Pub. L. No 105-33 ("BBA") § 4523(a).

40.  In 1999, Congress further amended section 1395*l*(t) to establish a permanent "hold-harmless" provision for outpatient services furnished by cancer hospitals, like UTMDA. *See* Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999,

Pub. L. No. 106-113 ("BBRA"), § 202(a)(3). That hold-harmless payment provision is codified in 42 U.S.C. § 1395*l*(t)(7).

41. Under the hold-harmless provision, cancer hospitals are entitled to payment of the greater of: (i) the amount that normally would be paid under the Medicare fee schedule that applies under the prospective payment system for hospital outpatient services; or (ii) a portion of the Hospital's current costs of services furnished to Medicare outpatients. *See* 42 U.S.C. §§ 1395*l*(t)(7)(D)-(F); 42 C.F.R. §§ 419.70(d)(2), (e)-(f).

42. To determine the portion of costs that are reimbursable to the Hospital under the hold-harmless provision, the Secretary is required to apply a "payment-to-cost" ratio derived from the Hospital's 1996 base year. 42 U.S.C. § 1395*l*(t)(7)(F)(ii). That ratio is calculated by dividing i) the amount of the Medicare payment made to the Hospital for outpatient services furnished to Medicare patients in the 1996 base year (the numerator), by ii) the "reasonable cost" of the services furnished in that 1996 base year (the denominator). *Id.*

43. In the initial implementing regulations, with an effective date of August 1, 2000, the Secretary defined the denominator of the fraction used to compute the payment-to-cost ratio to consist of the cost of covered outpatient services furnished in 1996 "without applying the cost reductions under section [1395x(v)(1)(S)] of the Act." 42 C.F.R. § 419.70(f)(2)(ii) (2000).

44. In November 2000, the Secretary removed the above-quoted language from the regulation. 65 Fed. Reg. 67798, 67814-15 (Nov. 13, 2000). The Secretary deleted "the phrase at issue" because he said it "may have inadvertently caused confusion." *Id.* Nevertheless, CMS's informal program instructions provide that the denominator of the

fraction used to calculate the payment-to-cost ratio includes the total cost of outpatient services before application of the 10% and 5.8% cost reduction factors  *See* Program Memorandum A-01-51 (Apr. 13, 2001).

**B.     Facts Specific to this Issue**

45.  The undisputed evidence on record and the stipulations of the parties below show that for the portion of the Hospital's 2000 fiscal year subject to the prospective payment system for hospital outpatient services, the Secretary's fiscal intermediary applied a payment-to-cost ratio of 84.00%.

46.  The undisputed evidence on record and the stipulations of the parties below show that for the Hospital's fiscal year 2001, the Secretary's intermediary adjusted the Hospital's payment-to-cost ratio down from 84% to 83.9%.

47.  The undisputed evidence on record and the stipulations of the parties below show that the Hospital's payment-to-cost ratio would be 89.26% if the denominator of the fraction used to calculate that ratio is decreased to exclude 5.8% of the operating costs and 10% of the capital-related costs of hospital outpatient services furnished by the Hospital during its 1996 base period.

48.  The undisputed evidence on record and the stipulations of the parties below show that the CMS-prescribed Medicare cost report form for the Hospital's 1996 cost reporting period excluded 5.8% of the operating costs and 10% of the capital-related costs of the services the Hospital furnished to outpatients in determining the "reasonable cost" that was reimbursed to the Hospital for that period.

49. In its decision in this case, the Board itself noted: "For the 1996 base year, section 1861(v)(1)(S)(ii) of the Act [*i.e.*, section 1395x(v)(1)(S)(ii)] further defined the reasonable cost of hospital outpatient services as including only the net amount after application of 5.8% and 10% cost reduction factors for operating and capital-related costs, respectively, of services furnished for outpatients." PRRB Dec. at 5.

50. Nevertheless, contrary to the facts presented here and the undisputed evidence, the Board concluded in a one-paragraph analysis of this issue that the 5.8% and 10% reduction factors are applied in a "subsequent step" after the determination of the "reasonable cost" of hospital outpatient services. The Board's analysis suggests, erroneously and contrary to the controlling legal authorities and undisputed evidence on record, that these reasonable cost reduction factors were used to determine the "payment" for hospital outpatient services but were not part of the determination of a hospital's reasonable cost of such services.

## VI.    SECOND ISSUE – ADJUSTMENT TO THE TARGET AMOUNT FOR COSTS OF NEW DRUGS FURNISHED TO HOSPITAL INPATIENTS

### A.    Legal Authorities Regarding Adjustments to the Target Amount

51. From the inception of the Medicare program in 1965 until 1983, Medicare reimbursed all hospitals for the reasonable costs or, if lower, customary charges for services furnished to inpatients.

52. The Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") established a rate-of-increase ceiling on the operating costs of inpatient hospital services, which is codified at 42 U.S.C. § 1395ww(b).

53. The TEFRA rate-of-increase ceiling, called the target amount, is calculated based upon the allowable Medicare operating costs in a hospital's 1983 base year divided by the number of Medicare discharges in that year and updated for inflation. *Id.*

54. If a hospital incurs operating costs in excess of its target amount for a fiscal year, the hospital is reimbursed for only a portion of the amount over the target amount. 42 C.F.R. § 413.40(d)(3).

55. In addition, a hospital may request an adjustment to the target amount to account for distortions in the comparison of the current year to the 1983 base period due to the provision of new services or other circumstances beyond the hospital's control. 42 U.S.C. § 1395ww(b)(4)(A)(i); 42 C.F.R. §§ 413.40(e) and (g).

**B.    Facts Specific to this Issue**

56. The base year used to establish the Hospital's target amount was its fiscal year ending in 1983.

57. For each of the 2000 and 2001 fiscal years at issue, the Hospital's operating cost of inpatient hospital services furnished to Medicare beneficiaries exceeded the target amount, updated for inflation and adjusted for the number of discharges.

58. For the Hospital's fiscal year 2000, its allowable operating cost of inpatient hospital services furnished to Medicare patients was $76,757,497 and its target amount was $63,757,848. In the NPR for that year, the fiscal intermediary allowed payment for the Hospital's target amount plus an additional payment in the amount $3,311,932, representing 50% of the difference between the Hospital's cost and 110% of the target amount. The

amount of operating cost which was not reimbursed in the NPR for fiscal year 2000 was $9,687,717.

59. For the Hospital's fiscal year 2001, its allowable operating cost of inpatient hospital services furnished to Medicare patients was $87,946,650 and its target amount was $73,569,098.    In the NPR for that year, the fiscal intermediary allowed payment for the Hospital's target amount plus an additional payment in the amount of $3,510,321, representing 50% of the difference between the Hospital's cost and 110% of the target amount.  The amount of operating cost which was not reimbursed in the NPR for fiscal year 2001 was $10,867,231.

60. The Hospital timely submitted requests for adjustments to the target amount for fiscal year 2000 and fiscal year 2001.    Among other things, the Hospital requested an adjustment for each year to account for the cost of new drugs furnished to inpatients that were not available for use, and were not included in the operating cost per discharge, in the 1983 base year used to establish the Hospital's target amount.

61. The undisputed evidence on record and the stipulations of the parties below show that for fiscal year 2000, the Hospital incurred a cost of $4,096,040 for new drugs that were furnished to Medicare inpatients in that year but were not approved for use in the 1983 base year.

62. The undisputed evidence on record and the stipulations of the parties below show that for fiscal year 2001, the Hospital incurred a cost of $4,255,991 for new drugs that were furnished to Medicare inpatients in that year but were not approved for use in the 1983 base year.

63.   The undisputed evidence on record and the stipulations of the parties below also show that costs of routine services (like room and board), and other overhead costs incurred by the Hospital in fiscal years 2000 and 2001 were slightly greater than, or remained nearly consistent with, the Hospital's routine and overhead costs per case in the 1983 base year, as updated for inflation.   In other words, as reflected in the following table, the costs of other services, not involving new drugs, did not significantly increase as compared to the 1983 base year adjusted for inflation:

|  | FY 2001 Operating Cost / Discharge | Base Year Operating Cost / Discharge | Base Year Updated for Inflation (1.87 Factor) | Difference Between FY 2001 and Base Year Updated |
|---|---|---|---|---|
| Overhead | 6,605 | 4,429 | 8,282 | <1,677> |
| Routine | 3,564 | 1,448 | 2,708 | 856 |
| Ancillary | 7,596 | 1,713 | 3,203 | 4,393 |
| Total | 17,766 | 7,589 | 14,191 | 3,575 |

64.   The Secretary's fiscal intermediary gave the Hospital notice of CMS's determinations on the Hospital's requests for adjustments to the target amount for fiscal years 2000 and 2001 by letter dated July 14, 2005.   CMS's determinations were implemented by the Intermediary in revised NPRs dated October 21, 2005.

65.   As implemented in the revised NPRs, CMS and the fiscal intermediary granted adjustments to the Hospital's target amount for some ancillary service departments that experienced increased staffing but allowed no adjustment for the cost of new drugs that were not approved for use in the base year.

17

66. The method CMS applied in reviewing the Hospital's requests for adjustments for fiscal year 2000 and 2001 only allowed for adjustments for cost increases attributable to increases in patients' overall average length of stay or to increases in staffing.

67. As shown in the argument and evidence the Hospital submitted to the PRRB, the formula that CMS applied to evaluate the Hospital's requests for adjustments for costs of new drugs would not allow for an adjustment for these costs even if average length of stay and staffing increased over the base year length of stay and staffing.

68. Thus, CMS effectively gave no consideration at all in its analysis to costs of the new drugs. This flaw in CMS's formulaic analysis was conceded in the proceedings before the Board by counsel for the Secretary's agent, who candidly acknowledged that CMS's formula defies logic: "I spent a lot of time trying to understand it and really couldn't come up with the rationalization, other than it's historically been used and never before been the subject of the Board – of a Board case . . . . I had the same difficulty with the formula that Mr. Keough had." PRRB Hearing Tr. at 38-40.

69. In its decision in this case, the Board found that "the specific cost of new drugs," for which the Hospital sought adjustments, "were not included in the base year." PRRB Dec. at 5.

70. Nevertheless, in its two-paragraph analysis of this issue, the Board concluded that the Hospital should not be granted an adjustment for these costs because "their impact cannot be estimated without an analysis of the services provided to Medicare recipients that demonstrates which drug applications are new and which are replacement services." PRRB Dec. at 6 -7.

71. The Board's decision failed to address the threshold question whether CMS's determination on the Hospital's request for an adjustment to account for the cost of new drugs satisfied the statutory and regulatory requirement that CMS account for distortions in costs attributable to new services.

72. The Board's decision also failed to identify any provision of the Secretary's program instructions in chapter 30 of the Provider Reimbursement Manual (CMS Pub. 15-1), which the Board purported to rely upon, that require a hospital to furnish documentation negating the existence of any possible offset against increased costs incurred since the base year to provide new services that were not included in the base year costs used to establish the target amount.

## VII.    ASSIGNMENT OF ERRORS

### A.    First Issue – Payment-to-Cost Ratio

73. The PRRB's decision affirming the Secretary's calculation of the payment-to-cost ratio is incorrect because it includes the 5.8% of operating costs and 10% of capital-related costs that are expressly excluded from statutory definition of the reasonable cost of hospital outpatient services in 42 U.S.C. § 1395x(v)(I)(S)(ii).    Under the applicable provisions of the APA, 5 U.S.C. § 706, the Board's decision on this issue should be set aside because:

   a. It is inconsistent with the plain meaning and manifest intent of the Medicare Act and,

19

b. It is an arbitrary and capricious departure from established agency precedent establishing that the "reasonable cost" of hospital outpatient services furnished in the 1996 base period excluded 5.8% of the operating costs and 10% of the capital-related costs of such services.

**B.    Second Issue – Target Amount Adjustment for New Drugs**

74.    The Board's decision affirming the Secretary's denial of an adjustment to the Hospital's target amount to account for the costs of new drugs that the Hospital furnished to Medicare inpatients in fiscal years 2000 and 2001 is incorrect because it is undisputed that the costs of those drugs were not included in the 1983 base year costs, the controlling statute and regulations require the Secretary to make an adjustment for a change in services furnished by a hospital after the base year, and CMS did not consider the costs of these new items or services in its analysis of the Hospitals' requests for adjustments.    Under the applicable provisions of the APA, 5 U.S.C. § 706, the Board's decision on this issue should be set aside because:

a. It is inconsistent with the plain meaning and manifest intent of the controlling provisions of the Medicare Act and implementing regulations governing adjustments to the target amount;

b. It is unsupported by substantial evidence in the record; and

c. It is otherwise arbitrary and capricious.

**VIII.  REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests an Order:

A.  Vacating the PRRB decision dated April 4, 2008;

B.  Reversing the Board's decision affirming the Secretary's denial of the requested adjustment to the target amount for the costs of new drugs furnished in the fiscal years at issue and directing the Secretary to adjust the Hospital's target amount to include the cost of new drugs furnished to Medicare inpatients in the years at issue;

C.  Reversing the Board's decision affirming the Secretary's calculation of the payment-to-cost ratio to the extent that it included 5.8% of the Hospital's operating costs and 10% of its capital-related costs in the reasonable cost of hospital outpatient services furnished in the 1996 base year and directing the Secretary to recalculate that ratio by excluding those costs from the denominator of the fraction used to compute the ratio derived from the Hospital's 1996 base year;

D.  Directing the Secretary promptly to pay the Hospital the additional sums due the Hospital as a result of the corrections required by the Court, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

E.  Directing the Secretary to pay legal fees and costs of suit incurred by the Hospital; and

D.  Providing such other relief as the Court may consider appropriate.

Respectfully submitted,

Christopher L. Keough
DC Bar No. 436567
KING & SPADING L.L.P.
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006-4706
(202) 626-5451
Counsel for Plaintiff

Dated:    June 3, 2008

CS-946
CKK

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

**I (a) PLAINTIFFS**

The University of Texas M. D. Anderson Cancer Center    85555

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___Harris___
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

King & Spalding
1700 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 737-0500

**DEFENDANTS**

Michael O. Leavitt, Secretary
United States Department of Health and Human Services

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

Case: 1:08-cv-00946
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 6/3/2008
Description: Admn. Agency Review

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◉ 2 U.S. Government Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**◉ C. Administrative Agency Review**

☒ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW 405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**    OR    **○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

③

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)  *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act)  *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities- Employment ☐ 446 Americans w/Disabilities- Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

42 U.S.C. § 1395oo(f); action for judicial review under the Medicare Act.

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 DEMAND $ _____ Check YES only if demanded in complaint JURY DEMAND: YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE June 3, 2008    SIGNATURE OF ATTORNEY OF RECORD *Christopher L. Brown*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.