## THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| * | |
| THE UNIVERSITY OF TEXAS | |
| M.D. ANDERSON CANCER CENTER, * | |
| | |
| Plaintiff, * | Civil Action No.: RDB-08-0946 |
| | |
| v. * | |
| | |
| KATHLEEN SEBELIUS, Secretary, * | |
| United States Department of Health | |
| and Human Services * | |
| | |
| Defendant. * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### <u>MEMORANDUM OPINION</u>

Plaintiff, the University of Texas M.D. Anderson Cancer Center (the "Hospital"), a leading center for cancer treatment and research, has filed this action against Kathleen Sebelius in her official capacity as Secretary of the United States Department of Health and Human Services (the "Secretary"). The Hospital maintains that the Secretary did not properly interpret and administer provisions of the Medicare program, and that, as a result, the Hospital did not receive sufficient reimbursement for the outpatient and inpatient costs it incurred in its fiscal years ending August 31, 2000 and August 31, 2001. More specifically, the Hospital claims that the Secretary improperly determined "reasonable cost" in calculating outpatient reimbursement and failed to properly adjust the target amount limits that cap inpatient reimbursement. Currently pending are the parties' cross-motions for summary judgment. The parties' submissions have been reviewed and a hearing was conducted on December 10, 2009. For the reasons explicated below, this Court holds that the Secretary's interpretations of the applicable statute and regulations were authorized and not arbitrary and capricious. Accordingly, Plaintiff's

Motion for Summary Judgment (Paper No. 14) is DENIED and Defendant's Cross-Motion for

Summary Judgment (Paper No. 16) is GRANTED.

## BACKGROUND

### A. The Medicare Program and Appeals Process

The Medicare program, a federally funded health insurance program for the aged and

disabled, is set forth in Title XVIII of the Social Security Act, commonly referred to as the

Medicare Act (the "Act"). 42 U.S.C. §§ 1395 *et seq*. Part A of the Act authorizes payment for

inpatient hospital services, 42 U.S.C. § 1395d(a)(1), and Part B of the Act provides for payment

of certain outpatient services. 42 U.S.C. § 1395k(a)(2)(B). The Centers for Medicare and

Medicaid Services ("CMS"), a component agency of the Department of Health and Human

Services, administers the Medicare program.

Under the Medicare program, hospitals and other "providers of services" enter into

contracts with the Secretary and interact with certain private insurance companies, or "fiscal

intermediaries." These fiscal intermediaries serve as agents of the Secretary and administer the

program by performing audit and payment services. *See* 42 U.S.C. § 1395h. At the end of each

fiscal year, a provider must submit to its intermediary a report listing all costs for which the

provider seeks reimbursement. 42 C.F.R. § 405.1801(b). The intermediary reviews the cost

report and then issues a Notice of Program Reimbursement ("NPR"), which announces the

intermediary's final determination on the amount of reimbursement owed to the provider. 42

C.F.R. § 405.1803.

A hospital may appeal an intermediary's final determination to the Provider

Reimbursement Review Board ("PRRB" or "Board"), an administrative tribunal appointed by

the Secretary. 42 U.S.C. § 1395oo(a), (b). The Board may hold a hearing and issue a decision

that is potentially subject to further review by the Secretary's delegate, the Administrator of CMS. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. Lastly, any final agency decision, whether rendered by the Board or the CMS Administrator, is subject to judicial review in a federal district court. 42 U.S.C. § 1395oo(f)(1).

## B. The Transition from Reasonable Cost Reimbursement to the Prospective Payment System of Reimbursement

In its original form, the Medicare statute authorized reimbursement of a hospital's "reasonable costs" in treating Medicare beneficiaries, which was normally equivalent to the costs incurred by the hospital that were deemed "allowable" under the Secretary's regulations. *See* 42 U.S.C. § 1395f(b)(1). However, because the reasonable costs system of reimbursement was considered to be too costly, Congress amended the Act on several occasions to implement measures aimed at incentivizing cost-savings. *See St. Barnabas Hosp. v. Thompson*, 139 F. Supp. 2d 540, 542 (S.D.N.Y. 2001). Many of these amendments served to transform the system of medical provider reimbursement from a "reasonable cost" basis, to a prospective payment system ("PPS"), which was designed to reduce costs and increase efficiency.

The Hospital's challenges in this case relate to two separate regulatory schemes that utilize the PPS methodology, one involving reimbursement for outpatient services and the other involving reimbursement for inpatient services. Both of these schemes specifically exempt major cancer treatment and research centers, such as the Plaintiff Hospital, from the normal PPS regime. The statutory provisions allow exempted providers to receive reimbursement for a portion of their current reasonable costs for outpatient services and to be reimbursed for their reasonable costs for inpatient services, subject to certain rate-of-increase limits.

The Hospital's separate challenges relating to outpatient and inpatient reimbursement, and the pertinent statutory contexts, are addressed in turn.

**STANDARD OF REVIEW**

As a general rule, summary judgment should be granted under Federal Rule of Civil Procedure 56 when the pleadings and evidence show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). However, in cases involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, the standard established in Rule 56(c) is inapplicable because the Court's role is limited to reviewing the administrative record. *See John L. Doyne Hospital v. Johnson*, 603 F. Supp. 2d 172, 178 (D.D.C. 2009); *see also* 42 U.S.C. § 1395oo(f)(1) (stating that judicial review of reimbursement decisions under the Medicare Act shall be made under APA standards).

Under the APA, the Administrator's decision can be set aside only if it was "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law," or "unsupported by substantial evidence . . . reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706. The arbitrary and capricious standard requires a reviewing court to consider whether the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Insurance Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). Accordingly, a court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotations omitted). The arbitrary and capricious standard is "highly deferential and presumes the validity of agency action." *United Mine Workers v. Dole*, 276 U.S.

App. D.C. 248, 870 F.2d 662, 666 (D.C. Cir. 1989) (internal quotation omitted).  A court's scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assoc.*, 463 U.S. at 43.  Thus, a reviewing court "must affirm if a rational basis for the agency's decision exists." *Bolden v. Blue Cross & Blue Shield Assoc.*, 270 U.S. App. D.C. 144, 848 F.2d 201, 205 (D.C. Cir. 1988).

In determining whether an agency's decision is supported by substantial evidence, courts are "highly deferential to the agency fact-finder, requiring only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rossello ex rel. Rossello v. Astrue*, 381 U.S. App. D.C. 477, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988)).  An agency decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Robinson v. Nat'l Transp. Safety Bd.*, 307 U.S. App. D.C. 343, 28 F.3d 210, 215 (D.C. Cir. 1994) (internal quotations omitted).

Courts review an agency's interpretation of a statute that the agency is charged with administering under the two-step analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  Under the Chevron framework, courts first determine whether Congress has directly addressed the "precise question at issue," and if it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.  However, if the statute is silent or ambiguous with respect to the specific issue, the court then must assess "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.  With regard to this second step, an agency's interpretation of a statute "need not be the best or most natural one by grammatical or other standards . . . Rather [it] need be only reasonable to warrant deference."

*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702, 111 S. Ct. 2524, 115 L. Ed. 2d 604 (1991) (citations omitted); *see also Bridgestone/Firestone, Inc. v. Pension Ben. Guaranty Corp.*, 282 U.S. App. D.C. 89, 892 F.2d 105, 110 (D.C. Cir. 1989) ("[a]s long as the agency's [construction of the statute is] consistent with the language and purpose of the statute, [the Court] must defer to the agency's interpretation").

Similarly, courts must afford "substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994). The task of reviewing courts "is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* at 512 (internal quotation marks and citations omitted). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program.'" *Id.* (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697, 115 L. Ed. 2d 604, 111 S. Ct. 2524 (1991)); *see also Methodist Hosp. of Sacramento v. Shalala*, 309 U.S. App. D.C. 37, 38 F.3d 1225, 1229 (D.C. Cir. 1994) (noting that the "tremendous complexity" of the Medicare program justifies the application of a heightened deference).

## DISCUSSION

### I.  Outpatient Reimbursement

### A.  Statutory Background for Reimbursement of Outpatient Costs

Payment for hospital outpatient services is set forth in section 1833 of the Act. *See* 42 U.S.C. §§ 1395(a)(2)(B), 1395*l*(t). As mentioned above, this section originally authorized payment for the "reasonable costs" of a hospital's services. The definition of "reasonable cost" is explicated in subsection 1861(v) of the Act. 42 U.S.C. § 1395x(v).

In an effort to control escalating Medicare costs, Congress has periodically implemented new reimbursement limitations for outpatient services. In 1972 Congress amended section 1833 to limit payment to the lesser of reasonable costs or charges. *See* Social Security Amendments of 1972, Pub. L. No. 92-603 § 233(b), *reprinted in* 1972 U.S.C.A.A.N. 1548, 1649-50; *see also* 42 U.S.C. §§ 1395*l*(a)(2)(B), 1395x(v). In 1990, Congress directed that outpatient reasonable cost payments be calculated by applying two reductions to reasonable costs: a 10 percent reduction for capital-related costs and a 5.8 percent reduction for non-capital related costs. *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4151(b)(1), 104 Stat. 1388, 1388-72 (1990), *codified as amended at* 42 U.S.C. § 1395x(v)(1)(S)(ii). These reductions were designed to be in effect from 1991 until outpatient PPS was implemented, or until 1999, whichever was later. 42 U.S.C. § 1395x(v)(1)(ii)(II).

In 1997, Congress again amended section 1833 of the Act, and directed the Secretary to implement a prospective payment system ("PPS") for outpatient hospital services, to be effective on January 1, 1999. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4523(a), 111 Stat. 251 (1997); 42 U.S.C. § 1395*l*(t). The terms of the 1997 Act were modified by Congress in 1999 in order to ease the burdens for transitioning to outpatient PPS. *See* Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999, Pub. L. 106-113, 113 Stat. 1501 (1999) ("BBRA"). Under the 1999 modification, Congress created a "transitional corridor," under which the transitional payments were extended until 2003. 65 Fed. Reg. 67798, 67814 (Nov. 13, 2000).

Nevertheless, while most providers had to transition to the PPS regime for reimbursement of their services, Congress exempted cancer hospitals from outpatient PPS. *See* BBRA, at § 202(a)(3); 42 U.S.C. § 1395*l*(t)(7). Towards this end, Congress inserted a permanent "hold

harmless" provision in subsection 1833(t) of the Act, which permitted cancer hospitals to receive payment for at least a portion of their current "reasonable costs" incurred through treatment of Medicare outpatients. *See* 42 U.S.C. § 1395*l*(t)(7); 42 C.F.R. § 419.70(d)(2), (e)-(f) (2001). Specifically, the hold harmless provision states that cancer hospitals shall receive payment for the greater of: (i) the amount that normally would be paid under the hospital's outpatient PPS fee schedule; or (ii) the product of the hospital's reasonable cost of services furnished in the current year multiplied by the hospital's payment-to-cost ratio. *See* 42 U.S.C. § 1395*l*(t)(7)(D)-(F). The statute defines the payment-to-cost figure as the ratio of Medicare payment to the hospital in the 1996 base year divided by the "reasonable cost" incurred for hospital outpatient services furnished by the hospital in the 1996 base year. *See* 42 U.S.C. § 1395*l*(t)(7)(F)(ii)(I). The determination of current year payment under the hold harmless provision is illustrated by the following formula:

Current Year Payment  =  Current Year Reasonable Costs  X  $\dfrac{\text{1996 Medicare Payments}}{\text{1996 Reasonable Costs}}$

## B. The Hospital's Challenge to its Reimbursement for Outpatient Services

The Plaintiff, the University of Texas M.D. Anderson Cancer Center (the "Hospital"), is a cancer treatment and research center and is therefore subject to the permanent hold-harmless provision under the prospective payment system for reimbursement of outpatient hospital services. 42 U.S.C. § 1395*l*(t). A.R. at 117 (Stipulation ¶ 3.1.) The PPS regime became effective on August 1, 2000, the first day of the last month of the Hospital's fiscal year ending August 31, 2000. *Id.*

The fiscal intermediary calculated the Hospital's payment-to-cost ratio to be 84.00 percent and applied this figure in determining the Medicare reimbursement made to the Hospital for outpatient services furnished in the last month of the fiscal year ending August 31, 2000.

A.R. at 117 (Stipulation ¶ 3.5).  The fiscal intermediary applied a payment-to-cost ratio of 83.9 percent in calculating payment to the Hospital for outpatient services furnished in its fiscal year ending August 31, 2001.  A.R. at 118 (Stipulation ¶ 3.6).  In arriving at these calculations for the payment-to-cost ratio, the fiscal intermediary did not apply the 5.8 and 10 percent reduction factors in its calculation of the ratio's denominator.  A.R. at 118.

The Hospital contends that the payment-to-cost ratio is more appropriately calculated to be 89.26 percent for the fiscal year ending in 2001.  The Hospital obtained this number by applying the 5.8 and 10 percent reduction factors set forth in the definition of "reasonable cost" to the denominator of the fraction.  A.R. at 118 (Stipulation ¶ 3.7).

After receiving the fiscal intermediary's final reimbursement determinations, the Hospital appealed to the Provider Reimbursement Review Board ("PRRB" or "Board"), which held a hearing on July 31, 2007.  A.R. 78-114.  The Board issued a decision on April 4, 2008, affirming the intermediary's decisions, and held that the 5.8 and 10 percent reduction factors did not apply to the denominator of the payment-to-cost ratio.  A.R. 5-12.

On May 30, 2008, the Administrator of the Centers for Medicare and Medicaid Services ("CMS") formally declined to review the Board's decision, making it a final agency determination.  A.R. at 1.  On November 17, 2008, the Hospital filed a complaint in this Court challenging the Board's decision.

### C.  Issue Presented

The parties' dispute in this case relating to the payment of outpatient hospital services centers on the calculation of the payment-to-cost ratio set forth in the hold harmless provision in section 1833 of the Medicare Act.  The calculation of the payment-to-cost ratio depends, in turn,

on the definition of "reasonable cost," as set forth in subsection 1961(v) of the Act. This definitional provision provides, in relevant part:

> (v)     Reasonable costs
>
> (1)(A)  The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services * * * *
> * * *
> (S)(i) * * *
> (ii)(I) Such regulations shall provide that, in determining the amount of the payments that may be made under this title with respect to all the capital-related costs of outpatient hospital services, the Secretary shall reduce the amounts of such payments otherwise established under this title by . . . 10 percent for payments attributable to portions of cost reporting periods occurring during fiscal years 1992 through 1999 and until the first date that the prospective payment system under section 1833(t) is implemented.
>
> (II) The Secretary shall reduce the reasonable cost of outpatient hospital services (other than the capital-related costs of such services) otherwise determined pursuant to section 1833(a)(2)(B)(i)(I) by 5.8 percent for payments attributable to portions of cost reporting periods occurring during fiscal years 1991 through 1999 and until the first date that the prospective payment system under section 1833(t) is implemented.

42 U.S.C. § 1395x(v).

Both parties view this provision as directing that the 10 percent and 5.8 percent reduction factors be applied in calculating the numerator of the payment-to-cost ratio, relating to the calculation of payments. However, the parties dispute whether these reduction factors must also be applied in arriving at the "reasonable cost" figure in the denominator of the ratio.

The Hospital contends that the 1996 reasonable cost figure must represent the net costs after application of the 5.8 and 10 percent reduction factors. It argues that the Secretary's failure to apply these reduction factors in calculating the ratio's denominator resulted in an improperly low figure for outpatient payment. The Hospital argues that the decision of the Board, in

affirming this calculation of the payment-to-cost ratio, must be set aside because it is contrary to the plain meaning of the statute and otherwise represents an arbitrary and capricious departure from established agency precedent.

The Secretary, on the other hand, contends that the Board's decision should be affirmed because it was based on a proper calculation of the Hospital's reimbursement for outpatient services. The statutory text instructs that the reduction factors be applied in calculating payments instead of costs.

## D. Analysis

The Medicare statute provides that the 5.8 and 10 percent reduction factors must be applied in calculating reimbursement payments to providers. However, it is not entirely clear from the statutory text, whether the reduction factors must apply in calculating "reasonable costs," or whether they must be applied to reduce "reasonable costs" in order to reach a calculation for "payments." Subsection 1861(v), which defines "reasonable costs," instructs the Secretary to promulgate regulations governing the calculation of reimbursement for both capital-related costs and non-capital-related costs. On their face, the two provisions setting forth the reduction factors are somewhat ambiguous due to the fact that they seem to employ the terms "payments" and "reasonable costs" interchangeably. The provision relating to capital-related costs instructs that the 10 percent reduction factor be applied to payments, whereas the provision relating to non-capital-related costs indicates that the 5.8 percent factor be applied to reasonable cost. *Compare* § 1861(v)(1)(S)(ii)(I) ("in determining the amount of payments . . . the Secretary shall reduce the amounts of such payments . . .[by] 10 percent for payments attributable . . . .), *with* § 1861(v)(1)(S)(ii)(II) ("The Secretary shall reduce the reasonable cost . . . by 5.8 percent for payments attributable to portions of cost reporting periods occurring . . . .").

The Hospital emphasizes that the reduction factors are located in subsection 1861(v) of the Act, which is a definitional provision that concerns the calculation of "reasonable cost." The reduction factors are also located in the implementing regulations, entitled "Medicare Principles of Reasonable Cost Reimbursement." *See generally* 42 C.F.R. Part 413. The Hospital contends that these provisions, which contain the reduction factors, may be contrasted with the statutory provisions that concern the calculation of "payments" in section 1833 of the Act, *see* 42 U.S.C. §§ 1395k and 1395*l*, which noticeably lack the reduction factors.

There is some appeal to the Hospital's argument that the general statutory structure and context would suggest that the reduction factors apply in the calculation of reasonable costs. *See County of Los Angeles v. Shalala*, 338 U.S. App. D.C. 168, 192 F.3d 1005, 1014 (D.C. Cir. 1999) (noting that under the first step of *Chevron*, courts "consider not only the language of the particular statutory provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part"). However, this construction does not square with the language of the provision establishing the 10 percent reduction, which refers to the calculation of payments, and does not refer to the term "reasonable costs." In addition, while the section establishing the 5.8 percent reduction does include the term "reasonable costs," this section could be read as providing that the 5.8 percent reduction be applied to arrive at a figure for "payments." *See* § 1861(v)(1)(S)(ii)(II) ("The Secretary shall reduce the reasonable cost . . . by 5.8 percent for *payments* attributable to portions of cost reporting periods occurring . . . .") (emphasis added).

As a result, this Court finds that the statute is "ambiguous with respect to the specific issue," and proceeds to step two of the process set forth in *Chevron*, to determine "whether the agency's answer is based upon a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The Secretary claims that under the hold harmless provision, the first step in determining

the amount of reimbursement for outpatient services is to take actual costs and then eliminate those costs found to be "unnecessary in the efficient delivery of needed health services," in order to arrive at the "reasonable cost" figure.  42 U.S.C. § 1395x(v)(1)(A).  Once such reasonable costs are determined, the reduction factors must be applied in order to calculate the Secretary's eventual payment to the provider.  The Secretary claims that the relevant statutory scheme and implementing regulations draw a critical distinction between payments and costs.  The hold-harmless provision, which was enacted after the reductions factors had been promulgated, reflects this same distinction between payments and costs.

The Secretary notes that the provision setting forth the 5.8 percent reduction "might be somewhat more ambiguous and susceptible of an alternative construction."  Def.'s Cross-Mot. Summ J. at 19.  Nonetheless, the Secretary maintains that this section should be read to apply the reduction factors when calculating payments in order to align with its companion section, which unambiguously applies the 10 percent reduction in determining payments.  In other words, the provisions can and should be consistently interpreted as instructing that reasonable costs be reduced to arrive at the final payment amounts.

Under the Secretary's interpretation, the reduction factors are only applied in calculating the "1996 Medicare Payment" figure in the numerator of the payment-to-cost ratio.  The Secretary argues that the Hospital's interpretation would result in mathematically untenable results.  Under the Hospital's approach, the current year reasonable costs and the 1996 reasonable costs would both be reduced by the same reduction factors.  In cases where there is no appreciable difference between current year reasonable costs and 1996 reasonable costs, the two numbers would largely cancel each other out and the resultant adjustment would be negligible.  Indeed, if outpatient reimbursement in this case was recalculated in the manner proposed by the

Hospital, the difference would be insignificant. In addition, since the reductions have already been made to the 1996 Medicare Payment figure in the numerator, the same cancelling effect could result between the ratio's numerator and denominator.

The Secretary previously referred to this problem during the notice-and-comment rulemaking process regarding the implementing regulations. *See* 65 Fed. Reg. 67798, 67814 (Nov. 13, 2000). As originally proposed, the regulation implementing the hold harmless provision explicitly stated that the denominator of the fraction did not include the reduction factors. 65 Fed. Reg. 18434, 18547 (Apr. 7, 2000). One commentator argued that unless the reduction factors applied to the denominator, an inconsistency would arise with the statutory definition of reasonable costs and that this would lead to improperly low payment calculations. However, the Secretary responded that the application of the reduction factors to the denominator would lead to unintended mathematical problems. The Secretary noted that "[i]f the intended purpose of the payment-to-cost ratio is to create a baseline percentage by which payments are calculated consistently from year to year, the 5.8% and 10% reductions simply cannot be taken from the denominator . . . . [W]e recognize that the phrase at issue may have inadvertently caused confusion to the extent it is redundant; accordingly, we are revising that section to remove the phrase." *Id.* at 67814-15.

This Court finds the Secretary's interpretation to be sufficiently reasonable and entitled to deference under step two of the *Chevron* analysis. *See Northpoint Technology Ltd. v. FCC*, 366 U.S. App. D.C. 363, 412 F.3d 145, 151 (D.C. Cir. 2005) ("'[a] reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made . . . ; an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not") (quoting *Chevron*, 467 U.S. at 844). The interpretation suitably

harmonizes the language of the provisions containing the reduction factors in subsection 1861(v)(1)(S)(ii), and comports with the statute's general structure and context, which draws a distinction between payments and costs. Finally, the interpretation makes mathematical sense and furthers the underlying purposes of the payment-to-cost ratio, which is to ensure that the provider receive a level of payment that approximates what the provider received prior to the implementation of the outpatient PPS. *See Continental Airlines Inc. v. DOT*, 269 U.S. App. D.C. 116, 843 F.2d 1444, 1452 (D.C. Cir. 1988) (noting that "the critical point is whether the agency has advanced what the Chevron Court called 'a reasonable explanation for its conclusion that the regulations serve the . . . objectives [in question]"); *SSM Rehabilitation Inst. v. Shalala*, 68 F.3d 266, 269 (8th Cir. 1995) ("[i]f the Secretary 'has given the text a reading that is linguistically possible and makes sense in light of the purposes of the [regulation],' her interpretation must prevail") (quoting *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408, 413 (7th Cir. 1987)).

Nevertheless, the Hospital argues that the agency's interpretation in this case is arbitrary and capricious because it is inconsistent with the Secretary's prior interpretations of analogous provisions. In two of its decisions from 2007, the CMS Administrator—on behalf of the Secretary—determined that the reduction factors were properly applied in determining the "cost recognized as reasonable" for ambulance services furnished under 42 U.S.C. § 1395*l*(t)(10). *See Decatur County Gen. Hosp. v. Blue Cross Blue Shield Ass'n / Riverbend Gov't Benefits Adm'rs*, CMS Adm'r Dec., Medicare & Medicaid Guide (CCH) ¶ 81,751 (June 27, 2007); *North Mem'l Health Care v. Blue Cross Blue Sheidl Ass'n / Noridian Admin. Servs.*, CMS Adm'r Dec., Medicare & Medicaid Guide ¶ 81,752 (June 27, 2007) (collectively "the *Decatur* Cases"). The determination of the CMS Administrator in the *Decatur* Cases was affirmed by this Court. *See Decatur County Gen. Hosp. v. Johnson*, 602 F. Supp. 2d 176 (D.D.C. 2009). The Hospital

argues that these prior rulings are directly relevant and that the statutory language in the *Decatur* Cases is indistinguishable from the language at issue in the present case.

The fundamental question in the *Decatur* Cases was whether the reasonable costs of ambulance services are properly classified as outpatient services, and therefore subject to the reduction factors during the transitional years before outpatient PPS took effect. Answering this question in the affirmative, the Secretary determined that the reduction factors properly applied to outpatient hospital services. In sustaining the decision of the Administrator, this Court held in *Decatur County Gen. Hosp. v. Johnson*, 602 F. Supp. 2d 176 (D.D.C. 2009) that: (1) ambulance services are hospital outpatient services; (2) "ambulance services, as hospital outpatient services, are subject to the 5.8 and 10 percent cost reduction factors;" and (3) the reduction factors properly applied to the base year costs. *Id.* at 183-87.

This Court finds that despite language in these prior decisions referring to reductions in "costs" (instead of "payments"), such statements are properly construed as *dicta*. The specific question of whether the reduction factors should be applied in calculating costs or payments was not raised in the *Decatur* Cases. This is apparent from the language in this Court's prior decision, which interchangeably refers to payments and costs. The background section of the opinion provides that through the definitional provisions in Section 1861, "Congress . . . mandated an across-the-board reduction in all *payments* for outpatient hospital services." *Decatur County*, 602 F. Supp. 2d at 180 (emphasis added). However, a subsequent portion of the opinion states that "the Court has already concluded that the 5.8 and 10 percent cost reduction factors are generally applicable to calculate the *cost* of ambulance services because they are hospital outpatient services." *Id.* at 186 (emphasis added). The imprecise use of the terms "payments" and "cost" reinforces the conclusion that this prior decision did not address the

specific matter at issue in the present case, namely, whether the reduction factors apply in calculating costs or payments. Thus, the statements in these prior decisions cannot be viewed as representing the Secretary's definitive position with respect to the application of the reduction factors.

Accordingly, summary judgment is entered in favor of the Defendant Secretary on the issue of the outpatient reimbursement. The Secretary's conclusion that the reduction factors do not apply in calculating the reasonable cost figure in denominator of the payment-to-cost ratio is based upon a reasonable interpretation of the relevant provisions of the Medicare Act.

## II.    Inpatient Reimbursement

### A. Statutory Context for Reimbursement for Inpatient Costs

In the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, § 101, 96 Stat. 324, *codified as amended at* 42 U.S.C. § 1395ww(b), Congress established "rate of increase limits" on reasonable cost reimbursement for participating hospitals' allowable inpatient operating costs. *See* 42 C.F.R. § 413.40. These limits, referred to as the target amounts, are calculated to be the hospital's operating costs per discharge in the base year of 1983, as adjusted for inflation. *See generally* 42 C.F.R. § 413.40. In 1983, Congress introduced the prospective payment system ("PPS"), which served to more dramatically limit reimbursement for inpatient services generally. However, when PPS was established for inpatient services, Congress exempted certain specialized hospitals, including cancer hospitals, which continued to be paid on a reasonable cost basis, subject to the target amount limits. *See* 42 U.S.C. § 1395ww(b), (d)(1)(B).

Under the reasonable cost repayment system, the target amount limits are designed to rise steadily and uniformly with inflation. However, the Act allows for adjustments to the method of

determining the target amount "where events beyond the hospital's control . . . create a distortion in the increase in costs for a cost reporting period . . . ." 42 U.S.C. § 1395ww(b)(4)(A)(i). The Secretary's regulations further provide that an adjustment may be warranted to accommodate factors, such as a change in the inpatient hospital services, that would result in a "significant distortion in the operating costs." [1] 42 C.F.R. § 413.40(g)(3). An adjustment may be granted by the Secretary only upon a finding that the costs are "attributable to the circumstances specified separately, identified by the hospital, and verified by the intermediary." 42 C.F.R. § 413.40(g)(1)(ii).

### B. The Hospital's Request for an Adjustment to its Target Amount

Because of its status as a leading cancer center, the Hospital qualifies to be reimbursed for its inpatient services on a reasonable cost basis as modified by the target rate-of-increase ceilings ("target rates") on operating costs. A.R. at 115-16.

The Hospital exceeded its target rates in its fiscal years ending in 2000 and 2001. A.R. at 116. The Hospital's expense overruns in these years were largely comprised of its costs for furnishing new drugs that were not approved for use until after the TEFRA base year of 1983. The actual cost of drugs sold to inpatients exceeded the Hospital's base year limit by approximately $4.8 million in fiscal year 2000 and by approximately $4.18 million in fiscal year 2001. *Id.*

---

[1] 42 C.F.R. § 413.40(g)(3) provides, in relevant part:

    (i)      Adjustment for Distortion. CMS may make an adjustment to take into account factors that would result in a significant distortion in the operating costs of inpatient hospital services between the base year and the cost reporting period subject to the limits.

    (ii)    Factors. The adjustments described in paragraph (g)(3)(i) of this section, include, but are not limited to, adjustments to take into account:

        . . .

    (E)      A change in the inpatient hospital services that a hospital provides . . . .

In 2004, the fiscal intermediary issued NPRs for fiscal years 2000 and 2001, which stated that reimbursement would be capped by the target amounts for those years. *Id.* The Hospital timely requested adjustments from the target amount limit for its inpatient costs for these two years. The CMS and the intermediary granted the requested adjustments for rising costs related to increases in patients' overall average length of stay and to increases in staffing. A.R. at 8, 1030-41. However, the CMS declined to make adjustments to the target amount to account for the costs of new drugs furnished in each of the two years at issue.

The Hospital appealed the CMS's denial of its request for adjustments relating to the cost of new drugs to the Provider Reimbursement Review Board ("PRRB" or "Board"). A hearing was conducted before the Board on July 31, 2007. A.R. 78-114. At the hearing, the parties stipulated that the cost of new drugs furnished was over $4 million in both of the years at issue. A.R. at 116. It was also established that these drugs did not receive FDA approval until after the 1983 base year. *Id.*

On April 4, 2008, the Board issued its decision affirming the CMS's denial of the new drug adjustment on the basis that the Hospital had not provided sufficient evidence in support of its request for modifications to the target amounts. A.R. at 5-12. The Board determined that "the Provider failed to quantify the net impact of the new drug technologies so that the increase in drug costs could properly be mitigated to the extent that they replaced existent drugs, therapies and/or ancillary services such as surgery and radiation." A.R. at 11.

The CMS Administrator subsequently declined to review the Board's decision, making it a final decision of the Secretary subject to appellate review in a federal court. A.R. at 1.

**C. Analysis**

The Hospital claims that the Board improperly affirmed the intermediary's denial of an upward adjustment to the target amount to account for its new drugs.   It contends that the Board's inpatient reimbursement decision is inconsistent with the plain meaning and intent of the pertinent Medicare statute and regulations, and is unsupported by substantial evidence.   In addition, the Hospital claims that the Board acted in an arbitrary and capricious manner when it issued, *sua sponte*, its determination based upon an unprecedented standard, without providing the Hospital with a meaningful opportunity to respond.   It claims that by not remanding the case to the CMS for proper resolution, the Hospital was deprived of its due process rights.   The Secretary, however, defends the Board's determination as appropriate due to the Hospital's failure to offer sufficient evidentiary support for its adjustment claim.

### i.) Challenge to the Secretary's Determination as Contrary to the Statutory Scheme and the Record Evidence

Before examining the parties' arguments in detail, it is instructive to emphasize the general goals and design of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") statute and its implementing regulations.  *See Dole v. United Steelworkers of America*, 494 U.S. 26, 35, 108 L. Ed. 2d 23, 110 S. Ct. 929 (1990) (noting that when determining congressional intent and "expounding a statute, [courts] are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (internal quotation marks and citations omitted).   TEFRA was designed to incentivize the economic behavior of medical providers, so that they could administer services more efficiently.  *See, e.g.*, *Cent. Me. Med. Ctr. v. Leavitt*, 552 F. Supp. 2d 50, 53 (D. Me. 2008).   This purpose is furthered by the imposition of target rates that are calibrated to cap the amount by which a provider's costs can increase from one year to the next, after adjustments for inflation.   42 USC § 1395ww(b); *see also* 42 C.F.R. § 413.30(b)(1).   Providers with operating costs that fall below the target

amount are eligible for bonuses, while providers whose operating costs exceed the target amount are subject to reimbursement reductions.  *See, e.g.*, *CHW West 13ay v. Thompson*, 246 F.3d 1218, 1221 (9th Cir. 2001).

Under the TEFRA regime, the inflation-adjusted target limits for inpatient reimbursement are applied as the default under normal circumstances.  However, providers may receive an exemption from the default by having the target limit adjusted, if they can establish that part of their cost increases resulted from a "distortion" created by "events beyond the hospital's control."  42 U.S.C. § 1395ww(b)(4)(A)(i).  The implementing regulations provide that an adjustment may be granted for certain factors, including "a change in the inpatient hospital services."  42 C.F.R. § 413.40(g)(3)(ii)(E).  The list of factors, however, is not exhaustive, and it is apparent that the Secretary enjoys considerable discretion in determining whether the provider has shown a "significant distortion" in its costs.

The Hospital correctly notes that the offset requirement imposed by the Board in this case is not explicitly mentioned in the applicable statutory scheme.  However, this Court finds that the Board's offset requirement is authorized by the statute and regulations, which afford the Secretary substantial interpretive and administrative leeway.  Moreover, the Board's requirement that the Hospital show the net impact of the new drug costs is consistent with the statutory scheme and its underlying purpose.  In order to confirm that a "distortion" in costs exists, it is understandable that the Secretary would expect a showing of the net impact of any cost overruns.  To arrive at such a net figure for the costs of new drugs, the Hospital was legitimately required to exclude any offsetting savings achieved by the provision of such drugs (or, alternatively, to make a showing that there were no offsetting savings).  Finally, the offset requirement reinforces TEFRA's goals of promoting cost-efficient behavior by providers.  The requirement that

providers show a distortion that represents the net impact to costs deters wasteful behavior and helps to prevent over-reimbursement.

The Hospital also challenges the Secretary's methodology for assessing adjustment requests, claiming that it is unduly "quantitative" and "mechanical and rigid." The Hospital argues that because of its evaluation process, the Secretary failed to account for the cost of new drugs, and thereby failed to "take account of significant distortions in cost" that arise from cancer hospitals' "use of rapidly changing treatment modalities." 49 Fed. Reg. 234, 274 (Jan. 3, 1984). The Secretary's informal program guidelines, set forth in the Provider's Reimbursement Manual (CMS Pub. 15-1), only refers to two factors: increases in a hospital's average patient length of stay and increases in hospital staffing, and does not mention the costs of new services such as the administration of new drugs. The Board is required to "afford great weight" to the manual guidelines. *See* 42 C.F.R. § 405.1867.

As an initial matter, this Court finds that the Secretary's process is appropriately rigorous and quantitative. The regulations require that the adjustment requests be bolstered by specific evidence of a "distortion in operating costs." 42 C.F.R. § 413.40(g)(3). That evidence must show that the cost overruns are "reasonable, attributable to the circumstances specified separately, identified by the hospital, and verified by the intermediary." 42 C.F.R. § 413.40(g)(1)(ii). This language instructs providers to substantiate their claims with relative precision—a task that is best achieved through the submission of quantitative evidence. In addition, while the informal manual guidelines do not mention many of the factors that could lead to cost increases, the Hospital cannot persuasively show that its adjustment request was improperly evaluated. After all, the Board *did* take into account the costs of new drugs and it recognized that such costs were not included in the base year. A.R. at 10-11. Nevertheless, the

Board's attempts to comprehend the manner and extent to which these costs may have replaced old drugs and other ancillary services was hindered—not by its evaluation process—but by the Hospital's failure to provide evidence on point. *Id.*

The Hospital contends that regardless of the propriety of the Secretary's statutory interpretation and its evaluation process, its ruling was improper because it failed to acknowledge that the Hospital had satisfied its burden of showing that its cost overruns were attributable to the costs of new drugs. Towards this end, the Hospital identified 120 new drugs that were provided to inpatients during the years at issue that had not been approved for use until after 1983 base year. A.R. at 1157-81. It established that its new drug costs approximated the amount by which its new drug costs exceeded its base year drug costs. A.R. at 116. The Hospital argues that if the cost of new drugs substantially replaced the cost of old drugs, then one would expect that the cost of the old drugs would have decreased on a per case basis since the 1983 base year. However, no such decrease occurred in this case after adjusting for inflation. Likewise, the Hospital's current costs could not have been artificially inflated by overhead costs, because overhead costs per case did not increase over the base year costs per case, after adjusting for inflation. A.R. at 30-31. Finally, the record reveals that the costs of other ancillary services did not decrease. *Id.* Thus, the Hospital contends, the only plausible conclusion that could be made from the evidence is that the new drugs did not categorically replace the costs of other services provided in the base year. The Hospital argues that as a result of its showing, the burden must shift "to the agency to provide a justification 'not based on the insufficiency of the [Hospital's] showing' that explains why the allegations were not accepted." Pl.'s Reply at 29 (citing *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 51 (D.D.C. 2008) (quoting *Atlanta*

*College of Med. and Dental Careers, Inc. v. Riley*, 300 U.S. App. D.C. 157, 987 F.2d 821, 830-31 (D.C. Cir. 1993)).

However, as the Board appropriately determined, the evidence provided by the Hospital merely depicts a correlation, namely, that the costs of new drugs were found to correspond with the amount by which the costs of new drugs exceeded the base year drug costs. The Hospital did not prove that its cost overruns were directly and solely caused by the provision of new drugs. Therefore, it was not unreasonable for the Board to require the Hospital to show "which drug applications are new and which are replacement services" in order to reveal the "net impact of the new [drugs] so that the increase in drug costs could properly be mitigated to the extent that they replaced existent drugs, therapies and/or ancillary serves such as surgery and radiation." A.R. at 10. Because of the Hospital's failure to produce adequate documentary evidence on this point, it is impossible to isolate whether the cost overruns are entirely related to the costs of the new drugs.

The Hospital retorts that the standard of proof proposed by the Secretary unfairly seeks proof of a negative and would be impossible to meet in practice. *See* Pl.'s Reply at 24 (claiming that the Secretary's standard "would seem to require reassessment of the entire treatment regimen of over 3,300 Medicare inpatients seen nearly 20 years ago"). It claims that the Secretary's standard is unrealistic considering the complexity of the Hospital's operations and the difficulty of documenting and cross-analyzing the services provided both in 1983 and during the 2000-2001 period.

However, the Hospital's protestations regarding the evidentiary standard propounded by the Secretary are unavailing. The Secretary pointedly notes that the Hospital "could have submitted affidavits from medical experts, or other evidence, explaining the function of the new

24

drugs and practices of the industry in 1983." Def.'s Cross-Mot. Summ. J. at 33. Such evidence

could have revealed the extent to which old drugs and services were being offset, if at all.

Compliance with the Secretary's standard would not require an evidentiary showing that

approached "absolute mathematical certainty." Pl.'s Reply at 35. Finally, there is no merit to

Hospital's suggestion that its evidentiary showing was sufficient to shift the evidentiary burden

to the Secretary. Plaintiff cannot point to any analogous case law that implements a burden-

shifting scheme under the instant circumstances.[2]

### ii) Challenge to the Secretary's Actions on Due Process Grounds

The Hospital contends that the Board's decision was arbitrary and capricious for the

independent reason that it failed to afford the Hospital the opportunity to respond in accordance

with due process mandates. The inadequacy of the Hospital's evidentiary showing was raised

*sua sponte* by the Board, and was never addressed by the intermediary or the CMS in prior

proceedings. The Hospital contends that it did not have fair notice of the offset requirement, as it

is not mentioned in the statute and regulations. Therefore, it posits that the Board should have

remanded the case to the CMS, where the Hospital could have the opportunity to address the

Secretary's standard.

Reviewing courts confer a "high level of deference" to an agency's interpretation of its

own regulations, *General Carbon Co. v. OSHRC*, 273 U.S. App. D.C. 394, 860 F.2d 479, 483

(D.C. Cir. 1988); such an interpretation is accepted as long as it is "logically consistent with the

---

[2] The two cases cited by the Hospital in support of its burden-shifting argument are inapposite.
*See Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20 (D.D.C. 2008); *Universal Camera v.
N.L.R.B.*, 340 U.S. 474, 95 L. Ed. 456, 71 S. Ct. 456 (1951). The burden-shifting scheme in
*Baystate* expressly applies only where the agency is in sole possession of the records at issue.
545 F. Supp. 2d at 51 (citing *Atlanta College of Med. and Dental Careers, Inc. v. Riley*, 300 U.S.
App. D.C. 157, 987 F.2d 821, 830-31 (D.C. Cir. 1993)). The language cited in *Universal
Camera* refers to Labor Board decisions and is not relevant in the current context. 340 U.S. at
488-90.

language of the regulations and . . . serves a permissible regulatory function." *Rollins Envtl. Servs., Inc. v. EPA*, 290 U.S. App. D.C. 331, 937 F.2d 649, 652 (D.C. Cir. 1991). Nevertheless, due process "prevents . . . deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." *Gates & Fox Co. v. OSHRC*, 252 U.S. App. D.C. 332, 790 F.2d 154, 156 (D.C. Cir. 1986). Courts have noted that "[i]f, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Gen. Elec. Co. v. EPA*, 311 U.S. App. D.C. 360, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

The Hospital correctly notes that "the statute, regulation, and agency precedent are all silent regarding any requirement to prove the absence of offsetting savings." Pl.'s Reply at 39. However, this observation alone is not dispositive of the issue of whether they were accorded due process. To pass constitutional muster, regulations need not provide "mathematical certainty" or "meticulous specificity;" indeed, they are appropriately designed with "flexibility and reasonable breadth." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Thus, "regulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." *Freeman United Coal Min. Co. v. Federal Mine Safety and Health Review*, 323 U.S. App. D.C. 304, 108 F.3d 358, 362 (D.C. Cir. 1997). The applicable regulations in this case are not unconstitutionally vague, and the Hospital was not

deprived of due process merely because the Secretary's interpretation was not expressly stated in the regulations.

The Hospital states that no deference is due to an agency's litigating position or any "*post hoc* rationalizations" for its actions, presented for the first time in a reviewing court. *See Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988). However, an agency's interpretation of its regulations in an administrative adjudication is an appropriate exercise of an agency's delegated lawmaking powers and is not a "*post hoc* rationalization.*" Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 151, 111 S. Ct. 1171, 113 L. Ed. 2d 117 (1991); *see Rock of Ages Corp. v. Secretary of Labor*, 170 F.3d 148, 156 (2d Cir. 1999) (noting that "an agency's interpretation of a regulation is not undeserving of deference merely because it is advanced by the agency for the first time").

During the Board's hearing in this case, the intermediary challenged the Secretary's evidentiary showing for failing to properly show cause and effect with respect to the cost overruns. In rendering its decision, the Board invoked the cause and effect argument as a basis supporting its decision that the Hospital had not substantiated its claim for further reimbursement. As this Court resolved above, the Secretary's construction of the regulations and its requirement of a showing of an offset are sufficiently consistent with the statutory scheme and purpose. Therefore, this Court holds that the Hospital—a sophisticated business entity—had fair notice of the Secretary's interpretation, as properly advanced during the adjudicative process. After a good faith consideration of the agency's regulations, the Hospital could identify, with "ascertainable certainty," that the agency would require the Hospital to identify any cost offsets. *See Gen. Elec. Co.*, 53 F.3d at 1329.

In addition, the Board provided an explanation for its decision that was reasonably logical and detailed. A.R. at 10-11. *See, e.g.*, *JIGC Nursing Home Co. v. Bowen*, 667 F. Supp. 949, 958 (E.D.N.Y. 1987) (noting that "an agency must give a reasoned explanation of its decision to enable the court to review the administrative determination, prevent arbitrary action, and inform the aggrieved party of the ground relied on so the party can plan a course of action"). Thus, the present case may be contrasted with the situation in *JIGC Nursing Home Co. v. Bowen*, 667 F. Supp. 949, 961-62 (E.D.N.Y. 1987), where the court found that the Secretary had applied a vague and inarticulate standard. In addition, in remanding the case to the Secretary for reassessment, the court in *JGIC Nursing* noted a host of procedural irregularities employed by the agency, which led the court "to wonder about the agency's good faith" in applying its standard.[3] *Id.* at 962. No such procedural vagaries or indications of bad faith were exhibited in this case.

In support of its argument that it did not receive fair notice of the Secretary's interpretation, Hospital points to *GranCare, Inc. v. Shalala*, 93 F. Supp. 2d 24 (D.D.C. 2000), where this Court held that the plaintiff health care providers lacked fair notice of the Secretary's interpretation of the "prudent buyer principle" set forth in the Medicare regulations and the

---

[3] In support of its ruling, the court noted:

> To try to review the agency's handling of plaintiff's exception requests is akin to wrestling with water. The agency disregarded the intermediary's recommendations and its own instructions to Blue Cross. It used inconsistent peer groups and undisclosed peer groups. It relied on them without any explanation of their relevance to the cost limits. It disregarded evidence from plaintiff about its services and patients. The agency criticized plaintiff for misallocating costs without explaining what should be reallocated. It used a nearly incomprehensible calculation to break down the cost limit into cost centers, and then cavalierly dismissed plaintiff's detailed efforts to explain itself against that breakdown. It mostly ignored plaintiff's criticism of the peer group comparisons on which the agency relied.

*JIGC v. Bowen*, 667 F. Supp. 949, 961-62 (E.D.N.Y. 1987).

agency guideline materials. In that case, it was determined that the Secretary's construction of the regulations was "not an obvious or anticipated reading" and was "not consistent with the description of the 'prudent buyer' principle in the PRM." *Id.* at 31. In addition, the court noted that defendant's "interpretation of the reasonable cost provisions is clearly inconsistent with the Secretary's prior interpretations of, and precedents established under, those regulations." *Id.* at 33.

The *GranCare* case illustrates a situation where the Secretary's interpretation was faulted on fair notice grounds because it conflicted with the applicable regulations, guidelines, and precedent. This stands in stark contrast to the present case, where the Secretary's interpretation is deemed to be reasonable and consistent with the language and purpose of the applicable statutory scheme. In addition, this is not a situation where the Secretary's interpretation contradicted an earlier construction of the same issue. Therefore, a comparison of *GranCare* with the present matter reinforces the conclusion that the Hospital has been afforded proper notice of the Secretary's decision, as set forth by the Board.

Finally, in support of its argument for remand, the Hospital points to a recent case, *Jordan Hosp. v. Leavitt*, 571 F. Supp. 2d 108 (D.D.C. 2008), which affirmed the CMS Administrator's authority to remand an issue to the CMS. The Hospital contends that this Court should follow the "principle established" in *Jordan Hospital*, which "requires that, at minimum . . . [a] case be remanded to the agency." Pl.'s Reply at 40. However, *Jordan Hospital* does not announce any universal principle regarding remand. In *Jordan Hospital* remand was warranted because one of the bases for the CMS' initial determination had been overruled in a subsequent

decision of the U.S. Court of Appeals for the District of Columbia Circuit.[4]  In the present case, no subsequent ruling or action served to invalidate any part of the CMS' initial decision.  The Board did not disagree with any aspect of the CMS' decision; it merely found an independent basis for affirming the CMS' denial of the Hospital's adjustment request.  Thus, there is no reason or circumstance in the present case that would compel the Board to remand to CMS.  The Hospital had a meaningful opportunity to respond to the Secretary's standard during the hearing before the Board; its due process rights were not violated just because it was not granted another bite at the apple.

In conclusion, the Secretary's interpretation of the statute and regulations was fully authorized by, and consistent with, the statutory scheme and its underlying purpose and intent.  It was not arbitrary and capricious to require the Hospital to prove the effect of any offset savings.  Finally, although proof of any offset savings is not explicitly set forth in the statute and regulations, the Hospital, as a sophisticated entity, had fair notice of the Secretary's interpretation, as announced in the adjudicatory process.  Consequently, summary judgment is granted to the Defendant Secretary with respect to the issue of inpatient reimbursement.

## CONCLUSION

---

[4] In *Jordan*, the CMS initially found that a newly-opened "skilled nursing facility" was not a "new" facility under the relevant program rules, because the plaintiff hospital had purchased a license to operate the new beds from a "nursing facility" that was already operating.  In reaching its decision, the CMS deemed "skilled nursing facilities" to be equivalent to "nursing facilities" because they provided "the same fundamental range of services."  *See Jordan Hosp. v. Blue Cross Blue Shield Ass'n / Associated Hosp. Servs.*, CMS Adm'r Dec., MEDICARE & MEDICAID GUIDE (CCH) ¶ 81,724 (Apr. 30, 2007).  Several years later, the CMS' deeming policy was invalidated by the U.S. Court of Appeals for the District of Columbia Circuit.  *See St. Elizabeth's Med. Ctr. of Boston v. Thompson,* 364 U.S. App. D.C. 492, 396 F.3d 1228, 1234 (D.C. Cir. 2005).  Following the decision in *St. Elizabeth's*, the CMS Administrator in *Jordan Hospital* remanded the case to CMS with instructions to apply the standard set forth by the Court of Appeals.

For the reasons stated above, this Court concludes that Plaintiff's Motion for Summary Judgment (Paper No. 14) is DENIED and Defendant's Cross-Motion for Summary Judgment (Paper No. 16) is GRANTED.  A separate Order follows.


Dated: April 19, 2010                              /s/_____
                                                   Richard D. Bennett
                                                   United States District Judge